UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PRIME TANNING CO., INC. and | ) | |
| PRIME TANNING CORP., | ) | |
| | ) | |
| Plaintiffs | ) | Civil No. 1:09-cv-359-JAW |
| | ) | |
| v. | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs Prime Tanning Co., Inc. and Prime Tanning Corp., and

move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

on the basis that there are no material issues of fact pertaining to the issue of Defendant

Liberty Mutual's duty to defend Prime Tanning Co., Inc. and Prime Tanning Corp. in

various civil actions pending in Missouri and that therefore, the Plaintiffs are entitled to

judgment as a matter of law on the issue of the duty to defend.  In support of this motion,

the Plaintiffs rely upon the pleadings filed to date, the Stipulation of Facts entered into by

the parties with attached exhibits, and the Affidavit of David Rosenblatt with attached

exhibits.

STATEMENT OF FACT

A.     The Underlying Civil Actions.

Approximately 17 separate civil actions have been commenced against Prime

Tanning Co., Inc. and Prime Tanning Corp. in a variety of courts in Missouri.[1]  Thirteen

of these specific actions have been identified in the Stipulation of Facts entered into

between the parties and the Statement of Material Facts at Paragraphs 1(a) - 1(m).[2]

Complete copies of the petitions and amended petitions in these actions are attached to

the Stipulation of Facts as Exhibits 1-17.  Some of these civil actions are against only

Prime Tanning and other parties with a relationship to Prime Tanning, such as National

Beef Leathers which purchased Prime Tanning Corp. assets in 2009 and Rick Ream, a

former Prime Tanning Corp. employee.  (See Petitions in *M. Gardner*, *Nicholson*, *Smith*).

A second group of petitions includes as defendants Wismo Chemical Corp., Elementis

LTP and Burns & McDonnell Engineering Co. because of their alleged role in the

development of the program for converting hexavalent chromium to trivalent chromium

for use in the tanning process.  (See Petitions in *Osborn*, *Beery*, *Kemper*, *Long*).  Another

group of actions includes additional defendants based on certain activities that are totally

unrelated to the activities of Prime Tanning.  (See Petitions in *Bicket*, *Fife*, *C. Gardner*,

---

[1]  The term "Prime Tanning" will be a reference to both companies.  When relevant to differentiate each company will be referred to by its full name.

[2]  Some civil actions were commenced very recently and are not included in this motion because Liberty Mutual has not had an opportunity to fully review and take a position.  However, this motion, and the accompanying Stipulation of Facts entered into by the parties, does included several underlying complaints that were not originally referenced in Plaintiffs' complaint for declaratory judgment because they had not yet been filed.  The parties to this case opted to include those underlying actions in the motion without the necessity of the Plaintiffs filing supplemental complaints to include those new actions since those actions are similar and the parties prefer that any Court order on the duty to defend impact as many of the civil actions as possible.  The parties consider it highly likely that any court ruling on the duty to defend the underlying actions identified in the stipulation ultimately will be dispositive of the same issue on the most recently filed underlying actions, but at least in theory the parties reserve the right to assert that there is something different about those underlying actions not currently being brought before the Court that warrants a different result.

*Helms*, *Meyer*, *Reid*, *Williamson*).  Some of the claims are individual personal injury claims, others are property damage claims, and some are asserted as class actions.

Prime Tanning Corp. is a wholly owned subsidiary of Prime Tanning Co., Inc. Prime Tanning Corp. and its predecessor companies operated a tanning facility in St. Joseph, Missouri.  This facility and other Prime Tanning Corp. assets were sold to National Beef Leathers in March of 2009.

The corporate history of Prime Tanning Corp. is set forth in the Statement of Material Facts, Paragraphs 28 to 32.  As revealed in that history, Prime Tanning Corp. is a successor entity to Berkshire Tanning Corp. and The Blueside Companies.  During the time period relevant to the Liberty Mutual coverage, *i.e.*, prior to July 1985, the named insureds in the Liberty Mutual policies during pertinent times included The Blueside Companies, Berkshire Tanning Corp. and Prime Tanning Co., Inc.  Neither The Blueside Companies nor Berkshire Tanning Corp. are named as defendants in any of the underlying civil actions because those companies are now named Prime Tanning Corp. and do not have a separate corporate existence.  Therefore, Prime Tanning Corp. must be considered an insured under the Liberty Mutual policy at issue.

All of the underlying complaints have certain allegations in common that are relevant to Liberty Mutual's duty to defend.  The complaints allege that Prime Tanning Corp. owned and operated a leather tanning facility in St. Joseph, Missouri.  Prime Tanning used certain chemicals to remove hair and other matter from hides in the tanning process.  The complaints allege that this process generated a sludge byproduct that

contained certain chemicals.  This sludge, considered a fertilizer, was spread on farms in several counties in Missouri.

Although all of the Underlying Petitions brought in Missouri clearly are based on the same activities of Prime Tanning, some of the Petitions contain factual allegations not present in others.  For example, several Petitions specifically allege that "the sludge was distributed as a useful product – land applied fertilizer," see SMF, ¶ 5, while the others simply allege that the sludge was spread on farms as a fertilizer.  Some of the Petitions specifically allege that a reconversion from trivalent chromium to the more harmful hexavalent chromium was "sudden and accidental."  See SMF, ¶ 6.  Certain Petitions specifically allege that the sludge "became airborne in the application process."  See SMF, ¶ 7.  As explained below, Prime Tanning does not believe these differences in the allegations impact the duty to defend, even though certain allegations, if ultimately proven to be true, may have implications with respect to indemnification.

The complaints vary slightly in stating the time frame that the spreading took place.  Several complaints use the phrase "from at least 1983 through early 2009 …." SMF, ¶ 4.  Other complaints use the phrase "from 1983 to 2009…."  SMF, ¶ 4.  Although the majority of the complaints clearly raise the possibility of relevant activity prior to 1983, that ambiguity need not be resolved for purposes of the duty to defend because Liberty Mutual provided coverage effective through July 1, 1985.  Prime Tanning's position is that it makes no difference whether Liberty Mutual's duty to defend is triggered under three policies, four policies or more policies.

B.     The Liberty Mutual Insurance Policies and Denial of Defense.

4

Liberty Mutual issued comprehensive general liability policies to Prime Tanning

Co., Inc. and other named insureds beginning in 1977 and ending on July 1, 1985.  SMF,

¶¶ 9-15.  The insurance policies do not contain any material differences relevant to the

duty to defend question in this case.

The basic coverage grant language in all of the Liberty Mutual policies reads as

follows:

> COVERAGE A—BODILY INJURY LIABILITY
>
> COVERAGE B—PROPERTY DAMAGE LIABILITY
>
> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> > Coverage A.  bodily injury or
> > Coverage B.  property damage
>
> to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

SMF, ¶ 20.  The terms "bodily injury," "named insured's products," "property damage,"

and "occurrence" are defined in all of the Liberty Mutual policies as follows:

> "bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefore;

> "named insured's products" means goods or products
> manufactured, sold, handled or distributed by the named
> insured or by others trading under his name, including any
> container thereof (other than a vehicle), but "named insured's
> products" shall not include a vending machine or any
> property other than such container, rented to or located for
> use of others but not sold;
>
> "occurrence" means an accident, including continuous or
> repeated exposure to conditions, which results in bodily
> injury or property damage neither expected nor intended from
> the standpoint of the insured;
>
> "property damage" means (1) physical injury to or destruction
> of tangible property which occurs during the policy period,
> including the loss of use thereof at any time resulting
> therefrom, or (2) loss of use of tangible property which has
> not been physically injured or destroyed provided such loss of
> use is caused by an occurrence during the policy period.

SMF, ¶ 21.

Liberty Mutual was placed on notice of all the underlying civil actions and has issued

written denials of coverage for all of those actions, which include a denial of both the

duty to indemnify and duty to defend.  SMF, ¶ 37.  Although the coverage denial letters

from Liberty Mutual note a wide variety of potential coverage issues, Liberty Mutual

predicates its denial of a defense on the pollution exclusion.  The pollution exclusion in

each of the Liberty Mutual policies reads as follows:

> Exclusions
>
> This policy does not apply:
>
> (f)   to bodily injury or property damage arising out of the
>       discharge, dispersal, release or escape of smoke, vapors,
>       soot, fumes, acids, alkalis, toxic chemicals, liquids or
>       gases, waste materials or other irritants, contaminants or
>       pollutants into or upon land, the atmosphere or any

> water course or body of water; but this exclusion does
> not apply if such discharge, dispersal, release or escape
> is sudden and accidental;

SMF, ¶ 22.

## ARGUMENT

A.      SUMMARY OF ARGUMENT

Since Liberty Mutual issued individual liability policies covering multiple companies with operations in a number of different states, a threshold choice of law question arises with respect to interpretation of the insurance policies.  In this case, the question is whether Maine or Missouri law governs the interpretation of the policies. Although for reasons set forth below, Prime Tanning believes Maine law applies, it does not appear that the law with respect to the duty to defend differs between Maine and Missouri in any manner that would impact the decision on that particular issue.

Liberty Mutual issued liability policies that clearly were in effect during some of the material times set forth in the underlying complaints.  All of the complaints contain allegations that at least arguably include claims for either "bodily injury" or "property damage" arising out of an "occurrence," and therefore those claims are within the threshold coverage of certain Liberty Mutual policies.  The principal basis for Liberty Mutual's denial of a defense is the pollution exclusion, specifically exclusion (f).  The pollution exclusion in the Liberty Mutual policies was a standard exclusion used in that time frame, *i.e.*, 1985 and applies to the release, discharge or escape of pollutants "upon land, the atmosphere or any water course of body of water."  The exclusion contains an express exception for any releases, discharges, etc. that are "sudden and accidental."

7

Since it cannot be ascertained as a matter of law from the face of these underlying complaints that the pollution exclusion ultimately will apply to every aspect of these claims, Liberty Mutual has an obligation to defend Prime Tanning in each of those cases.

Liberty Mutual's duty to defend is joint and several and extends to the entire cost of defense. The duty to defend is not prorated between covered and uncovered claims based on some default formula. Although Liberty Mutual may be entitled to contribution from any other insurer Liberty Mutual believes also has a duty to defend, the duty to defend is not analogous to the duty to indemnify, where threshold liability for a judgment at least arguably might be based on a method of proration, such as time on the risk.

Since Liberty Mutual's duty to defend was clearly established under existing precedents in both Maine and Missouri, Liberty Mutual is responsible for attorneys' fees incurred in this declaratory judgment action establishing the duty to defend, in addition to the attorneys' fees and costs incurred by Prime Tanning in defense of the underlying civil actions.

B.     OVERVIEW OF THE LAW GOVERNING THE DUTY TO DEFEND.

       (1)     The Choice of Law Issue.

A federal court sitting in diversity must apply the conflict of law rules of the state in which it sits, in this case, Maine. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *Auto Europe, LLC v. Connecticut Indemnity Co.*, 321 F.3d 60, 64 (1st Cir. 2003). Maine has adopted the approach set forth in the Restatement (Second) Conflict of Laws with respect to these issues, specifically Sections 6, 188 and 193. *See Baybutt Construction Corp. v.*

8

*Commercial Union Insurance Co.*, 455 A.2d 914, 918 (Me. 1983); *Walker v. UNUM Life*

*Insurance Company of America*, 530 F.Supp.2d 351, 353 (D.Me. 2008); *Auto Europe*,

*supra* at 64.  Section 193 reads as follows:

> § 193.  Contracts of Fire, Surety or Casualty Insurance
>
> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

In this case, Liberty Mutual issued several policies with Prime Tanning Co., Inc. as named insured on the declaration page and the first named insured on endorsements adding additional named insureds, including the Blueside Companies, Inc. and Berkshire Tanning Corp., amongst others.  As noted above, Prime Tanning Corp. is the successor to Blueside and Berkshire.  The address to which the policy was issued is the Prime Tanning Co., Inc. address in Berwick, Maine.  The Liberty Mutual policies were issued for delivery and delivered in the State of Maine and therefore are controlled by Maine's Insurance Code.  See 24-A M.R.S.A., § 2401.

The other named insureds include operations in Massachusetts and Missouri.  Item 4 in each of the declaration pages identifies the premium base and premiums for each of the locations.  SMF, ¶¶ 24-27.  The Prime Tanning Co., Inc. operations in Maine are the dominant location of the overall risks being insured under these policies.  The Blueside

Companies, Inc. was a Missouri company and the Berkshire Tanning Corp. a Massachusetts company.

The question is whether these single insurance policies should be potentially subject to different meanings based on the particulars of each cause of action, or whether a single interpretation is most appropriate under these circumstances. In fact, Prime Tanning has made prior claims for coverage from Liberty Mutual in connection with waste disposal sites in Maine, Massachusetts and Missouri. Therefore, the prospect of divergent interpretations of a single policy to identical situations is a real one if the law of the single state with the most dominant exposure is not selected as governing. SMF, ¶¶ 33-36. Liberty Mutual had agreed to defend and indemnify Prime Tanning in connection with all three of the waste disposal site claims in the 1980's based on the same Liberty Mutual insurance policies that are at issue in this matter. Although in some situations it may be appropriate to subject a single policy to multiple interpretations when physical risks are located in various states <u>and</u> state laws establish certain coverage requirements, *see, e.g.,* Comment f. to Section 193, that principle should not apply in this case for a couple of reasons.

Liberty Mutual had the option of placing a choice of law provision in its insurance policies and chose not to do so. It did not include any other provision suggesting that the single policies may be subject to differing interpretations under different state laws, depending on the particulars of a given case. Neither is this a case in which a Missouri law compels a certain form of insurance or scope of coverage for particular risks physically located in Missouri. Finally, Missouri has no public policy interest in

10

applying an interpretation of the policy less favorable to both the businesses operating in Missouri and the Missouri residents allegedly injured by those business activities. An insurer that issues a single policy that covers more than one related entity and operations in more than one state should not be able to avoid application of the law of the state in which the policy was issued and the dominant location of the risks insured by the policy when considered in their totality, if that is the applicable law most favorable to both the insureds and claimants. This is an issue Liberty Mutual could have controlled by contractual language, and cannot credibly claim surprise at the application of Maine law to any issue arising under this policy if Maine law is more favorable to the insured and other interested parties.

      (2)    <u>Maine Law on the Duty to Defend</u>.

Maine law regarding the duty to defend is well-developed and not in dispute. The general rule is that the duty to defend is governed by the "comparison test" pursuant to which the allegations in the complaint are compared to the provisions of the insurance policy. *See Penney v. Capitol City Transfer, Inc.*, 1998 ME 44, 707 A.2d 387, 388; *Elliott v. Hanover Insurance Co.*, 1998 ME 138, 711 A.2d 1310. If that comparison reveals <u>any</u> possibility of a finding that would activate the coverage, the insurer has an obligation to provide a defense. Even a "remote" possibility of coverage is sufficient to trigger a defense. *See Maine Bonding & Cas. Co. v. Douglas Dynamics, Inc.*, 594 A.2d 1079 (Me. 1991). All doubts regarding the potential for coverage must be resolved in favor of the insured and the duty to defend.

11

The duty to defend by its nature is determined summarily at the beginning of a case, without any requirement for a trial, and is never determined retrospectively. *See Northern Security Insurance Co. v. Dolley*, 669 A.2d 1320 (Me. 1996). The insurer cannot rely upon facts extrinsic to the complaint to deny a defense. *See Elliott v. Hanover Insurance Co.*, 1998 ME 138, 711 A.2d 1310; *York Insurance Group of Maine v. Lambert*, 1999 ME 173, 740 A.2d 984. In *Elliott*, the Law Court held that an insurer could not even rely upon a direct statement by its own insured that brought the matter outside coverage, as those facts did not appear in the complaint. In *Lambert*, the Court found that it was improper to consider filings in an action subsequent to the complaint, such as answers to interrogatories, to support a determination of no duty to defend. In *Lambert*, the Court found a duty to defend because of the potential for a claim for emotional distress, *i.e.*, "bodily injury," even though no express allegation of emotional distress appeared in the complaint and the Plaintiff's answers to interrogatories indicated such a claim was not being brought.

An insurer also cannot rely upon facts expressly pled in the complaint to deny a defense if the Plaintiff need not prove those facts in order to prevail. *See Auto Europe, LLC v. Connecticut Indemnity Co.*, 321 F.3d 60 (1st Cir. 2003) (interpreting Maine law). This rule flows from the fact that the duty to defend is governed by the mere potential for indemnification, and a fact pled in a complaint that need not be proved for the plaintiff to prevail is nothing more than a gratuitous allegation that does not inform the ultimate duty to defend inquiry of whether there is a potential liability within coverage. In *Auto Europe*, the presence of an express allegation of uncovered fraud did not eliminate the

12

duty to defend a claim for unfair trade practices that did not require proof of fraud as an element.

An insurer obligated to defend because of one aspect of a claim must defend the entire action unless the defense of covered and uncovered claims is clearly segregable, which almost never is the case. *See Gibson v. Farm Family Mutual Insurance Co.*, 673 A.2d 1350, 1353-54 (Me. 1996). Therefore, the question is not whether the complaint asserts certain claims that would not be covered, or even whether non-covered claims predominate, but whether the complaint gives rise even to a remote possibility that <u>any</u> aspect of the claim may come within coverage. No distinction is drawn between claims that may not be covered because they are within an exclusion vs. claims that may not be covered because in whole or in party they may fall outside a coverage period. *See Commercial Union Insurance Co. v. Royal Insurance Co.*, 658 A.2d 1081 (Me. 1995).

Even factual possibilities not mentioned in the complaint may trigger a defense. *See York Insurance Group of Maine v. Lambert*, 1999 ME 173, 740 A.2d 984; *Maine State Academy of Hair Design, Inc. v. Commercial Union Insurance Company*, 1997 ME 188, 699 A.2d 1153. In *Maine State Academy of Hair Design*, the Court held that the possibility of tortious conduct outside the work environment, even though not alleged in the complaint nor supported by any extrinsic evidence, created an obligation to defend because that theoretical possibility would place the claim outside an otherwise applicable exclusion for injury to an employee arising out of employment.

Although the Law Court has stated many times the general rule prohibiting an insurer from looking outside the complaint to extrinsic evidence to <u>deny</u> a defense, it has

13

not addressed the inverse situation, *i.e.*, whether in the case of an ambiguous pleading or a pleading that on its face is suggestive of noncoverage, an insurer is obligated to consider extrinsic evidence that demonstrates the potential for coverage. This does not establish a double standard. The denial of a defense requires an actual resolution as a matter of law of no possibility of coverage. In contrast, a duty to defend is triggered merely by the existence of an unresolved issue if one resolution may be within coverage. Most jurisdictions require insurers to consider that type of extrinsic evidence because the duty to defend is driven by the potential for indemnification, and that potential often is revealed by extrinsic evidence more so than the complaint. *See, e.g., Open Software Found, Inc. v. United States Fidelity & Guar. Co.*, 307 F.3d 11, 14-15 (1st Cir. 2002) (Mass. Law); *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1007 (10th Cir. 2006); *ACE American Ins. Co. v. Ascend One Corp.* 570 F.Supp.2d 789 (D.Md. 2008); *NWL Holdings, Inc. v. Discover Property & Cas. Ins. Co.*, 480 F.Supp.2d 655, 658 (E.D.N.Y. 2007); *Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 350 Mont. 184, 206 P.3d 919 (2009); *Monticello Ins. Co. v. Essex Ins. Co.*, 162 Cal. App. 4th 1376, 76 Cal. Rptr. 3d 848 (2d Dist. 2008); *Shafe v. American States Ins. Co.*, 288 Ga.App. 653 S.E.2d 870 (2007); *See generally* 1 Ostrager and Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES 15 Ed., § 5.02[a][2][B] (2010). In practice, the Maine Law Court actually has gone even further than those jurisdictions. As exhibited in *Maine State Academy of Hair Design*, a factual possibility not stated in the complaint created a duty to defend even without the presentation of extrinsic evidence suggesting that possibility existed.

(3)     <u>Missouri Law on the Duty to Defend</u>.

Missouri law is not different than Maine law in any material respect regarding the duty to defend.  As in Maine, the duty to defend in Missouri is much broader than the duty to indemnify.  *See Truck Insurance Exchange v. Prairie Framing, LLC*, 162 S.W.2d 64, 80 (Mo.App. 2005).  The duty to defend exists when the insured is exposed to potential liability based on the facts stated at the outset no matter how unlikely it is that the insured will be found liable.  *Id.* at 79.  An insurer's duty to defend is determined initially by comparing the relevant policy provisions with the allegations of liability in the petition.  If the allegations and ascertainable facts establish any potential of possible coverage, then the insurer has a duty to defend.  *Id.*  This duty to defend exists even if the complaint contains other claims that would not be covered.  *Id.*  Since the duty to defend derives from the mere potential of a liability that may be within coverage, factual allegations in a complaint that a plaintiff need not prove in order to establish liability by definition cannot form the basis for a denial of a defense.  A subsequent finding of no duty to indemnify does not have any retroactive impact on the duty to defend.  <u>See</u> *Liberty Mutual Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 924 (8th Cir. 1998) (applying Missouri law).

C.     LIBERTY MUTUAL HAS AN OBLIGATION TO DEFEND PRIME
       TANNING CORP. AND PRIME TANNING CO., INC. IN EACH OF
       THE UNDERLYING CIVIL ACTIONS.

       (1)     <u>The Pollution Exclusion Does Not Permit a Denial of a Defense
               Because the Nonapplication of the "Sudden and Accidental"
               Exception Cannot be Determined as a Matter of Law</u>.

The seminal Maine case regarding the duty to defend an environmental claim is *Travelers Indemnity Company v. Dingwell*, 414 A.2d 220 (Me. 1980).  Dingwell operated a waste disposal facility and sought coverage from various insurers in connection with a class action claim for damages.  The pollution exclusion clauses of two of the insurers was the same pollution exclusion in the Liberty Mutual policies with the "sudden and accidental" exception.  The lower court held that there was no duty to defend because the complaint did not specifically allege sudden and accidental releases, thereby failing to implicate the exception to the exclusion.

The Law Court in *Dingwell* held that the lower court erred by requiring that a complaint state a specific allegation which, if proven, would establish liability within the coverage of the policies.  Rather, "the correct test is whether a potential for liability within the coverage appears from whatever allegations are made."  *Id.* at 226.  The Law Court further explained:

> If we were to look beyond the complaint and engage in proof of actual facts, then the separate declaratory judgment actions, such as the case at bar, would become independent trials of the facts which the defendant would have to carry on at his expense.  Moreover, once an inquiry begins into the actual facts, the insured will have already begun defending against liability, and the issue in respect to the insurer will be its ultimate duty to indemnify, not its duty to defend.  We see no reason why the insured, whose insurer is obligated by contract to defend him, should have to try the facts in a suit against his insurer in order to obtain a defense.

*Id.* at 226.  The Law Court found that the pollution exclusion did not eliminate a duty to defend because it could not be ascertained at this early stage whether the "sudden and accidental" exception would or would not apply.

16

In the 30 years since the *Dingwell* decision, the law regarding the duty to defend has not called into question the soundness of that decision. In fact, the law has been further refined in ways that reinforce the correctness of that decision. An insured's right to a defense cannot be eliminated by a plaintiff's whim in either not mentioning certain facts or inserting facts in a complaint that are not actually determinative on the ultimate question of the insured's liability. Even the presence of a specific factual allegation that would take a claim outside of coverage does not defeat the duty to defend if that fact need not be proved in order for the plaintiff to prevail. That principal necessarily follows from the fact that the duty to defend is governed by the potential for a liability within the coverage, and pleaded facts unnecessary to establishing liability can never be determinative of that question. *See Auto Europe, LLC v. Connecticut Indemnity Co.*, 321 F.3d 60, 68 (1st Cir. 2003).

More recently, the First Circuit reaffirmed the basic principles set forth in *Dingwell* in *Barrett Paving Materials, Inc. v. Continental Insurance Co.*, 488 F.3d 59 (1st Cir. 2007). In *Barrett Paving*, the Court held that Continental Insurance had a duty to defend despite the environmental nature of the claims and the presence of a standard pollution exclusion. The Court held that the inquiry was limited to the allegations in the complaint, not the facts as they may actually exist, and that it could not be concluded as a matter of law based on the complaint that the sudden and accidental exception to the pollution exclusion did not apply. The Court in *Barrett Paving* distinguished its decision of 16 years earlier in *A. Johnson & Co. v. Aetna Casualty & Surety Co.*, 933 F.2d 66 (1st

Cir. 1991), in which the Court found no duty to defend despite the presence of a "sudden and accidental" exception given the nature of the allegations in that particular case.[3]

Whether any particular release or discharge of a substance was or was not "sudden and accidental" is not determinative of whether the plaintiffs in these underlying cases may prevail in one or more of their claims.  The "non-sudden and non-accidental" nature of the release, escape or discharge is not a necessary element to each of the stated causes of action.  Therefore, even if these complaints specifically alleged that a release was <u>not</u> "sudden and accidental" or pled facts that suggested it was not, such gratuitous allegations could not defeat the duty to defend because Prime Tanning could be found liable without any regard whatsoever to the truth of those factual allegations.

The pollution exclusion is not focused solely upon the discharge of a pollutant "upon land," but also specifically references the atmosphere or any body of water.  In addition, the sudden and accidental exception applies if any dispersal, release or escape into either the atmosphere or a body of water is "sudden and accidental."  The exception could apply even if an earlier placement of the substance "upon land" was not "sudden and accidental."  Therefore, the potential applicability of the exception to the exclusion is not ruled out simply because the fertilizer byproduct was spread upon certain land prior to its release or escape either into the atmosphere or into a body of water.

---

[3]  Liberty Mutual may argue that the *A. Johnson* case is more analogous to the present case than either *Dingwell* or *Barrett Paving*.  Although the Court in *Barrett Paving* had no need to overrule its decision in *A. Johnson*, the Court likely would reach a different result today in that case given the intervening decision in *Auto Europe*.  In *A. Johnson & Co.*, the Court relied upon factual statements in a letter, not even a complaint, in concluding as a matter of law that a sudden and accidental exception could not conceivably apply.  The problem with that conclusion is that those facts set forth in the letter may have been untrue, and yet the insured would still have liability under the environmental laws at issue.

Nothing in the case law in Missouri suggests that it applies any different test or standard.  In various Missouri cases, insurers (including Liberty Mutual) have been found obligated to defend environmental-related claims involving the same pollution exclusion. *See, e.g., Liberty Mutual Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 924 (8th Cir. 1998).  It remains unresolved exactly how and when various substances may have escaped or been released, either in the atmosphere or in the groundwater, so as to allegedly harm persons or property distinct from the specific location where the fertilizer was spread.

      (2)    <u>The "Pollution Exclusion" Does Not Apply to Claims Based on the Use of a Commercial Product When Being Used in the Fashion Contemplated for Such Product</u>.

Liberty Mutual's position requires that the fertilizer product being spread on the farms is deemed a pollutant or contaminant as a matter of law for purposes of exclusion (f).  However, the criteria for application of the pollution exclusion is not simply whether the substance that was discharged, released or escaped was a chemical substance that could cause harm.  Since the material in question was prepared by Prime Tanning to serve as a fertilizer, application of the pollution exclusion to the use of the fertilizer should not be treated any differently in this case than if the same fertilizer product was sold by a fertilizer manufacturer and used in a similar fashion.

Case law establishes that the pollution exclusion is sufficiently ambiguous so as not to apply to liabilities arising out of the use of a product in the fashion contemplated for that product.  In *Nautilus Insurance Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999), the Court, interpreting Maine law, held that the more comprehensive "total pollution

19

exclusion" did not apply to claims of injury arising out of the release or escape of a harmful chemical in the roofing cement being used by a roofing company. The Court reasoned that the pollution exclusion was not intended to apply in a situation in which a product was being used in the fashion expected for such products. It did not matter that the actual chemicals in the cement clearly would be considered contaminants and pollutants in a different context, *i.e.*, following disposal of those materials in a waste dump or other indiscriminate discharge into the environment.

The approach in *Nautilus* was followed more recently in *Hastings Mutual Insurance Co. v. Safety King, Inc.*, 2009 W.L. 4114143 (Mich. App. November 24, 2009). In *Hastings Mutual*, the insured utilized pesticides containing triclosan in the course of providing air duct cleaning services. The Court found that the terms "irritant" and "contaminant" have unambiguous meanings in the context of the pollution exclusion:

> An "irritant" is a substance that, because of its nature and under the particular circumstances, is generally expected to cause injurious or harmful effects to people, property, or the environment. And, considered in context, a "contaminant" is a substance that, because of its nature and under the particular circumstances, is not generally supposed to be where it is located and causes injurious or harmful effects to people, property, or the environment.

One certainly expects a fertilizer to be used in an agricultural setting and to be spread on certain property. Such fertilizer, with proper composition and handling, is not expected to be injurious or harmful in that setting. One possible factual basis for Prime Tanning's liability in this case consists of nothing more than an alleged negligent failure to test the product, or negligence in failing to monitor what happens to the product when it may

interact with other substances after being spread.  It cannot be determined as a matter of law from the petitions alone that the pollution exclusion should even apply as a threshold matter to the spreading of fertilizer, placing aside the issue of the "sudden and accidental" exception.

D.     IF LIBERTY MUTUAL'S DUTY TO DEFEND IS TRIGGERED UNDER ONE OR MORE INSURANCE POLICIES, LIBERTY MUTUAL HAS THE DUTY TO DEFEND THE ENTIRE CASE AND NOT SIMPLY A PRO RATA SHARE OF THE DEFENSE COSTS.

Liberty Mutual may argue that even if it has a duty to defend, that duty is limited to a small proportion of the defense costs because Liberty Mutual provides coverage for only a few years of the total years of alleged exposure.  Liberty Mutual asserts that its defense obligation in the first instance is no greater than its pro rata share of defense costs based on time on the risk.  This position directly conflicts with the scope of the duty to defend as established under both Maine and Missouri law and improperly interjects into the defense issue allocation concerns relevant only to indemnification.

Case law and commentary addressing allocation of responsibility amongst insurers in environmental or other "long-tail" cases is voluminous.  The majority of the cases address the issue in the context of indemnification.  Although there are a number of permutations, the two basic approaches are proration of liability on some equitable basis and joint and several liability with a right of pro rata contribution in favor or any insurer that has paid more than its alleged, allocable share.  In environmental cases, proration most often is based on time on the risk, with the possibility of policy limits also entering into the formula.  The allocation problem arises only in cases in which one cannot

21

actually ascertain what damages or injury were caused in what policy period. If the actual timing of damage or injury could be established, then each insurance policy by its terms would be responsible for indemnification only for the damage arising during its policy period. Since that rarely is the case in environmental exposure claims, one must default to either a joint and several liability rule or a pro rata rule based on some equitable basis.

Regardless of how this Court might resolve the allocation issue in the context of indemnification, those principles do not carry over to the duty to defend. The duty to defend is distinguishable with respect to both the insurance policy language and the general principles underlying the duty to defend. The insuring grant language of the Liberty Mutual policies contains indemnification language that is separate from the language establishing the duty to defend. The indemnification language obligates Liberty Mutual to "pay on behalf of the insured all sums which the insured becomes legally obligated to pay as damages because of [bodily injury or property damage] to which this policy applies…." The definitions of "bodily injury" and "property damage" are both limited to injury or damage "which occurs during the policy period." Therefore, the indemnification obligation is triggered by injury or damage during the policy period. Jurisdictions applying a joint and several approach to the indemnification obligation rely upon the "all sums" language in holding that once the indemnification clause is triggered, an insurer is responsible for all injury or damage if it is not actually segregable. The jurisdictions favoring pro rata allocation argue that the coverage grant language is not simply triggering language, but rather limiting language, and therefore the problem of an

indivisible injury or property damage should be resolved by a default mechanism that has some equitable basis, such as allocation by time on the risk.

The defense obligation, however, arises from entirely different language. The Liberty Mutual policies state that the insurer "shall have the right and duty to defend <u>any suit</u> against the insured seeking damages on account of such bodily injury or property damage...." (emphasis added) This language unambiguously requires defense of the suit that contains allegations triggering potential coverage, not some proportionate share of the suit. Even if the language was susceptible to more than one reasonable interpretation on this point and therefore ambiguous, that ambiguity must be resolved in favor of the insured Prime Tanning. See, *e.g.*, *Barrett Paving Materials, Inc. v. Continental Insurance Co.*, 488 F.3d 59, 66 (1st Cir. 2007); *Nautilus Insurance Co. v. Jabar*, 188 F.3d 27, 29-30 (1st Cir. 1999)

An insurer who has an obligation to defend because a complaint contains a potential claim within coverage must defend the entire suit even if it contains claims clearly outside of coverage. *See Gibson v. Farm Family Mutual Insurance Co.*, 673 A.2d 1350 (Me. 1996). The only exception, rarely applicable, is when the costs associated with defending the uncovered claims are clearly segregable from the costs of defending the potentially covered claim. The Law Court has never sanctioned some "rough justice" approach to allocating defense costs between an insurer and insured when certain claims in a complaint are not covered. An insurer with an obligation to defend must defend the entire suit even if the potentially uncovered claims predominate, whether the reason for

potential noncoverage is a substantive exclusion or when an occurrence may have been triggered.

The language establishing the indemnification and defense obligations is so materially different that carrying over concepts of allocation applicable to the indemnification issue into analysis of the defense cost issue is not appropriate.  Insurers absorbing costs associated with the defense of non-segregable uncovered claims is commonplace.  The same cannot be said for uncovered portions of a judgment. Therefore, Liberty is responsible for the entire, reasonable defense costs without regard to how this Court might resolve the problem of allocation in the indemnification context.

<u>CONCLUSION</u>

For the foregoing reasons, the Plaintiffs request that their motion for partial summary judgment be granted and that the Court declare that Liberty Mutual is obligated to defend Prime Tanning in the underlying actions and reimburse Prime Tanning for all defense costs incurred in those actions and the attorneys' fees incurred in this case.

Dated at Portland, Maine this 12th day of April, 2010.

/s/ James D. Poliquin
James D. Poliquin, Esq.
Attorney for Plaintiffs

NORMAN, HANSON & DeTROY, LLC
415 Congress Street
P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
jpoliquin@nhdlaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


Certificate of Service

I hereby certify that on April 12, 2010, I electronically filed Plaintiffs' Motion for Partial Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Michael Richards, Esq.             John C. Sullivan, Esq.
Troubh Heisler                     Post & Schell, P.C.
511 Congress Street                Four Penn Center
P.O. Box 9711                      1600 John F. Kennedy Blvd. -13th floor
Portland, ME  04104-5011           Philadelphia, PA  19103
mrichards@troubhheisler.com        jsullivan@postschell.com


/s/ James D. Poliquin, Esq.
Norman, Hanson & DeTroy, LLC
415 Congress Street
P.O. Box 4600
Portland, ME  04112-4600
(207) 774-7000
jpoliquin@nhdlaw.com

25