UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PRIME TANNING CO., INC. and    )
PRIME TANNING CORP.,            )
                               )
         Plaintiffs,           )
                               )        CV-09-359-B-W
     v.                        )
                               )
LIBERTY MUTUAL INSURANCE CO.,  )
                               )
         Defendant.            )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Prime Tanning Co., Inc. and Prime Tanning Corp. (Prime Tanning) and
Liberty Mutual Insurance Co. (Liberty Mutual) filed cross-motions for summary
judgment on whether Liberty Mutual has a duty to defend Prime Tanning against
civil actions pending in Missouri (the Missouri Suits); Liberty Mutual also moves for
summary judgment on whether it has a duty to indemnify Prime Tanning in the
Missouri Suits.[1]  Because the allegations in the Missouri Suits' complaints foreclose
coverage under the policies, the Court finds Liberty Mutual has neither a duty to
defend nor to indemnify and grants Liberty Mutual's motions.[2]

## I.    STATEMENT OF FACTS

### A.    The Dispute

---

[1] Prime Tanning Co., Inc. is a Maine corporation with its principle place of business in Maine.  *Prime Tanning Compl.* Attach. 2 ¶ 1 (Docket # 1).  Prime Tanning Corp. is a wholly-owned subsidiary of Prime Tanning Co., Inc. with its principle place of business in Missouri.  *Liberty Mutual's Statement of Material Facts* ¶ 2 (Docket # 31) (*DSMF*).  Liberty Mutual is a Massachusetts insurance company with its principle place of business in Massachusetts.  *Id.* ¶ 3.

[2] Because the Court finds that Liberty Mutual does not have a duty to defend, the Court does not reach the scope of the defense, defense costs, or whether certain activities were conducted by joint venture.

From at least 1983 through early 2009, Prime Tanning owned and operated a leather tanning facility in St. Joseph, Missouri through its subsidiary, The Blueside Companies, Inc. *Prime Tanning's Statement of Material Facts* ¶ 2 (Docket # 25) (*PSMF*).[3] The leather tanning process uses chemicals to remove hair from animal hides, which in turn generates a sludge byproduct. *Id.* ¶ *3*.[4] Prime Tanning spread its byproduct on farms in several counties throughout Missouri beginning in 1983 and continuing until early 2009. *Id.* ¶¶ 2-4.

Between August 21, 2008 and June 8, 2009, nine Missouri farm owners sued Prime Tanning for damages arising from its tanning activities. *Prime Tanning Compl.* ¶ 5*; see also Bicket Compl.* Attach. 2; *Fife Compl.* Attach. 4; *C. Gardner Compl.* Attach. 6; *M. Gardner Compl.* Attach. 8; *Helms Compl.* Attach. 10; *Kemper Compl.* Attach. 13; *Long Compl.* Attach. 16; *Nicholson Compl.* Attach. 18; *Reid Compl.* Attach. 19 (Docket # 23)[5]. Prime Tanning notified Liberty Mutual of each suit; Liberty Mutual denied that it had a duty to defend or indemnify Prime Tanning. *PSMF* ¶ 37. On July 17, 2009, Prime Tanning filed a declaratory judgment action in Maine Superior Court against Liberty Mutual, claiming that Liberty Mutual breached the insurance contract when it refused to defend Prime

---

[3] Berkshire Tanning Corp. and The Blueside Companies, Inc. merged in early 1985 and through subsequent shell corporations and mergers became The Blueside Co., Inc., which in December of 1995 changed its name to Prime Tanning Corp. *Stipulation of Material Facts* ¶¶ 24-31 (Docket # 23) (*Stip. of Mat. Facts*).

[4] Both parties seek the definitional high ground. Prime Tanning refers to the byproduct as a "fertilizer." *PSMF* ¶ 3. Liberty Mutual characterizes it as a "sludge" and a "waste product." *Liberty Mutual's Opposing Statement of Material Facts* ¶ 3 (Docket # 32). The Court uses the neutral term "byproduct."

[5] Prime Tanning's complaint lists only eight original suits. *Prime Tanning Compl.* ¶ 5. Including Maycee Gardner's complaint filed on April 27, 2009, the Court counts nine. *M. Gardner Compl.* Attach. 8 (Docket # 23).

Tanning. *Prime Tanning Compl.* While the Maine action was pending, additional parties filed similar claims against Prime Tanning. *PSMF* ¶ 1. Liberty Mutual refused to defend these suits as well. *Id.* ¶ 37.

Prime Tanning removed the case to this Court on August 10, 2009. *Notice of Removal* (Docket # 1). On April 12, 2010, Prime Tanning filed a Motion for Partial Summary Judgment, asking the Court to find that Liberty Mutual had a duty to defend it in the Missouri Suits. *Prime Tanning's Mot. for Partial Summ. J.* (Docket # 26) (*Prime Tanning's Mot.*). The next day, Liberty Mutual moved for summary judgment, claiming it had no duty to defend or indemnify Prime Tanning. *Liberty Mutual's Mot. for Summ. J* (Docket # 30); *Mem. of Law in Support of Liberty Mutual's Mot. for Summ. J.* Attach 1 (Docket # 30) (*Liberty Mutual's Mem.*). On May 3, 2010, Liberty Mutual responded to Prime Tanning's motion. *Liberty Mutual's Resp. to Prime Tanning's Mot. for Partial. Summ. J.* (Docket # 33) (*Liberty Mutual's Resp. to Prime Tanning's Mot.*). On May 4, Prime Tanning responded to Liberty Mutual's second motion. *Prime Tanning's Resp. to Liberty Mutual's Mot. for Summ. J.* (Docket # 34) (*Prime Tanning's Resp. to Liberty Mutual's Mot.*). On May 18, Prime Tanning replied to Liberty Mutual's response to its motion. *Prime Tanning's Reply in Support of Mot. for Partial Summ. J.* (Docket # 37) (*Prime Tanning's Reply to Liberty Mutual's Resp.*). On the same day, Liberty Mutual replied to Prime Tanning's response to its second motion. *Reply of Liberty Mutual in Support of Mot. for Summ. J.* (Docket # 39) (*Liberty Mutual's Reply to Prime Tanning's Resp.*). On May 20, 2010, the parties jointly moved for oral argument.

*Joint Mot. for Oral Argument* (Docket # 40).  The Court granted the motion on June 7, 2010.  *Order Granting Mot. for Oral Argument* (Docket # 41).  The Court held oral argument on July 20, 2010.

### B.    The Policy

Between May 1, 1977 and July 1, 1979, and again between July 1, 1980 and July 1, 1985, Liberty Mutual issued annual "Comprehensive General Liability Insurance" policies to Prime Tanning Co., Inc., Prime International Corporation, and The Blueside Companies, Inc.  *Liberty Mutual's Comprehensive General Liability Policy Issued to Prime Tanning* Attachs. 22-28 (Docket # 23) (*Policies*).[6]  If the injury or damage giving rise to the Missouri Suits falls within the general coverage outlined in Section I of the policies, Liberty Mutual has a duty to defend Prime Tanning.  Section I states, in relevant part, that

> [t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> > Coverage A.  bodily injury or
> >
> > Coverage B.  property damage
>
> to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

---

[6] Berkshire Tanning Corp. was added to the policies effective July, 1 1981.  *Policies* Attach. 25, at 23 (including Berkshire Tanning Corp. in list of insured companies).  It remained a named insured throughout the rest of the policies' duration.  *Policies* Attachs. 26-28.  Although not explicitly named, Liberty Mutual conceded at oral argument that Prime Tanning Corp. is also covered by the policies as a successor in interest to The Blueside Companies, Inc.

The parties agree that any differences between the policies do not impact Liberty Mutual's duty to defend.  *Prime Tanning's Mot.* at 5; *Liberty Mutual's Mem.* at 6-8 (citing all the policies collectively).  The Court cites to the policy recorded at Attachment 22, Docket Number 23.

*Policies* at 16. The parties do not dispute that Prime Tanning's conduct caused damage or injury which falls within the general coverage of the policies.[7] The complaints plainly allege either "bodily injury" or "property damage" arising out of an "occurrence." *See Prime Tanning's Mot.* at 7 (explaining that the policy generally applies because the Missouri Suits allege "bodily injury" or "property damage" arising out of an "occurrence"); *Liberty Mutual's Mem.* at 1 (saying the principle issues presented are the applicability of the pollution exclusion and its "sudden and accidental" exception).

The policies include an exclusion that removes certain pollution damage from the general coverage. The "pollution exclusion" specifies that the policies do not apply

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water . . . .

*Policies* at 16. The pollution exclusion, however, has its own limiting exception: the policies provide coverage if such "discharge, dispersal, release or escape is sudden and accidental." *Id.* In other words, if the pollution exclusion denies general coverage under the policies, Liberty Mutual does not have a duty to defend Prime Tanning unless the "sudden and accidental" exception to the exclusion applies.

## C. The Missouri Suits

---

[7] Liberty Mutual denies that the *Helms* and *Nicholson* complaints allege either physical or emotional injury or physical damage to or loss of use of property because they seek medical monitoring expenses. *Liberty Mutual's Opposing Statement of Material Facts* ¶ 8. However, Liberty Mutual does not argue that these harms are outside the initial coverage of the policies. Because the Court finds there is no duty to defend the Missouri Suits, it does not reach whether medical monitoring expenses constitute "bodily injury" within the meaning of the policies.

The parties agree in their briefs and conceded at oral argument that all the Missouri Suits are substantially the same and any differences do not impact coverage. *Liberty Mutual's Mem.* at 4; *Prime Tanning's Mot.* at 4. Although some complaints frame the factual allegations in somewhat different terms, all the petitions read along the following lines:

> 7. [Prime Tanning] owned and operated a leather tanning Facility . . . in St. Joseph, Missouri . . . until the first quarter of 2009 . . . .
> . . .
>
> 9. Hexavalent chromium is a toxic chemical and is classified as a known human cancer causing agent.
>
> 10. From at least 1983 through early 2009, Prime utilized hexavalent chromium to remove hair from its hides in the tanning process. The waste product from this process was collected as "sludge" that contains hexavalent chromium.
> . . .
>
> 12. . . . Prime represented to the State of Missouri that the Prime sludge did not contain hexavalent chromium when in fact such sludge did contain hexavalent chromium.
>
> 13. From at least 1983 through early 2009, Prime hauled thousands of tons of sludge containing hexavalent chromium to Missouri farms, including farms in Andrew, Buchanan, DeKalb and Clinton counties, and applied thousands of tons of sludge containing hexavalent chromium to such farms with a spreader. The sludge was applied free of charge to farmers as fertilizer so that Prime could avoid the costs of landfilling the sludge.
>
> 14. The sludge applied to the fields in Missouri contains hazardous levels of hexavalent chromium that is above acceptable limits of human exposure. Portions of the sludge became airborne in the application process.
> . . .
>
> 18. As a direct and proximate result of Defendants' negligence and strict liability, [the plaintiff] has and will continue to suffer severe, permanent, and progressive injuries and damages.

*M. Gardner Compl.* Attach. 8 ¶¶ 7, 9-10, 12-14, 18 (Docket # 23).  *See also Bicket 1st Am. Compl.* Attach. 3 ¶¶ 11, 33-34, 36-38, 42 (*Bicket Compl.*), *Fife Compl.* Attach. 4 ¶¶ 11, 33-34, 36-38, 42, *C. Gardner Am. Compl.* Attach. 6 ¶¶ 32, 34-35, 37-39, 41-42, *Helms Am. Compl.* Attach. 10 ¶¶ 32, 34-35, 37-39, 41, *Meyer Compl.* Attach. 17 ¶¶ 33-34, 36-38, 42, *Nicholson Compl.* Attach. 18 ¶¶ 15-16, 18-20, *Reid Compl.* Attach. 19 ¶¶ 33-34, 36-38, 42 (Docket # 23).[8]  All the complaints base their claims on some form of negligence and strict liability.[9]

## II.  DISCUSSION

### A.  The Parties' Positions

#### 1.  Prime Tanning

Prime Tanning recognizes that the familiar pleading comparison test in which the allegations in the complaint are compared to the provisions of the insurance policy determines whether there is a duty to defend under both Maine

---

[8] A second category of complaints contains the same set of facts but is pleaded more artfully. Although having no impact on the duty to defend, the Court considers the facts as set out by both categories of complaints.  The second category alleges

> 13. From at least 1983 through early 2009, Prime utilized chromium in the tanning process at the St. Joseph, Missouri facility.  The residual product from this tanning process was collected and distributed as a useful product—land-applied fertilizer.
> . . .
> 15. Prime and Elementis formed a joint venture called Wismo.  Prime, Elementis and Wismo engaged in the conversion of Elementis hexavalent chromium to trivalent chromium at Prime's leather tanning facility in St. Joseph, Missouri.  The conversion process failed in that the chromium used at the tanning facility in St. Joseph, Missouri could and did suddenly and accidentally re-convert to hexavalent chromium in the tanning process and thereafter in the product that became land applied fertilizer.

*Long 2d Am. Compl.* Attach. 16 ¶¶ 13, 15 (*Long Compl.*) (Docket # 23);*see also Osborne 2d Am. Compl.* Attach. 7 ¶¶ 13, 15, *Beery Compl.* Attach. 11 ¶¶ 35, 37, *Kemper 1st Am. Compl.* Attach. 13 ¶¶ 14, 16, *Smith Compl.* Attach. 20 ¶¶ 15, 17, *Williamson Compl.* Attach. 21 ¶¶ 12, 14 (Docket # 23).
[9] The *Bickett*, *Fife*, *Meyer*, and *Reid* complaints also allege wrongful death.  *Bickett Compl.* ¶¶ 73-78; *Fife Compl.* ¶¶ 73-78; *Meyer Compl.* ¶¶ 73-78; *Reid Compl.* ¶¶ 73-78.

and Missouri law. *Prime Tanning's Mot.* at 11, 15 (citing *Penney v. Capitol City Transfer*, 1998 ME 44, 707 A.2d 387, 388; *Truck Ins. Exchange v. Prairie Framing, LLC*, 162 S.W.2d 64, 80 (Mo. App. 2005)). Prime Tanning argues that the duty to defend depends on whether there is any potential basis for coverage, including grounds not raised by the complaints, not on whether the "factual allegations in a complaint that may have significance for coverage, but need not be proved or even subsequently mentioned by a plaintiff to succeed on liability" provide a potential basis. *Prime Tanning's Reply to Liberty Mutual's Resp.* at 2-3 (citing *Auto Eur., LLC v. Conn. Indemn. Co.*, 321 F.3d 60 (1st Cir. 2003) (applying Maine law)). Considering that such facts are nothing more than "gratuitous" allegations that do not "inform the ultimate duty to defend inquiry," *Prime Tanning's Mot.* at 12, Prime Tanning asserts that the Court may not deny the duty "because of the presence of a factual allegation that may not be true and has no significance to the insured's liability." *Prime Tanning's Reply to Liberty Mutual's Resp.* at 3. Although acknowledging that the pleading comparison test compares the allegations in the complaint to the terms of the policies, *Prime Tanning's Mot.* at 11, Prime Tanning argues that the comparison test does not sanction "a robotic review of the factual allegations in the complaint." *Prime Tanning's Reply to Liberty Mutual's Resp.* at 3. Rather, Prime Tanning explains that the test is "a mere tool in achieving the goal of not having any situation ever occur in which an insurer does not defend a claim when at the end of the day there may be some aspect of liability within coverage." *Id.* at 2.

Using this modified formulation of the comparison test, Prime Tanning argues that the pollution exclusion does not apply under Maine law because it does not apply to liabilities arising out of the use of a commercial product "in the fashion contemplated for that product." *Prime Tanning's Mot.* at 19. In other words, Prime Tanning claims the exclusion should not apply because it prepared and used the byproduct as a fertilizer. *Id.* Citing *Nautilus Insurance Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999) (applying Maine law), which found a similar exclusion imposed a duty to defend against claims arising from the release of a harmful chemical in properly applied roofing cement, Prime Tanning contends that the applicability of a pollution exclusion turns on whether the byproduct "was being used in the fashion expected for such products." *Prime Tanning's Mot.* at 20. According to Prime Tanning, whether the byproduct would be considered a pollutant in a different context, such as "following disposal of [the byproduct] in a waste dump or other indiscriminate discharge into the environment," is beside the point. *Id.* Prime Tanning distinguishes *Casualty Indemnity Exchange v. City of Sparta*, 997 S.W.2d 545 (Mo. Ct. App. 1999) on the same ground. Although *City of Sparta* found no duty to defend under a similar exclusion, Prime Tanning argues it did so because the case involved "the spreading of sewerage waste from the City." *Prime Tanning's Reply to Liberty Mutual's Resp.* at 4. In contrast, Prime Tanning asserts its byproduct was "monitored, prepared and spread with specific approval from environmental agencies." *Id.*

If the pollution exclusion applies, Prime Tanning argues that the "sudden and accidental" exception must also apply because of two uncertainties raised by the complaints. First, Prime Tanning argues that the Court cannot determine as a matter of law "the precise chemical composition of the fertilizer immediately prior to application or after application and integration with other substances at the farms." *Prime Tanning's Reply to Liberty Mutual's Resp.* at 6. Second, Prime Tanning argues that the Court cannot determine the manner in which "any allegedly harmful chemicals actually made their way into the environment." *Id.* Therefore, Prime Tanning argues that the possibility that the chemicals made their way into the environment suddenly and accidentally cannot be foreclosed as a matter of law. Because *Travelers Indemn. Co. v. Dingwell*, 414 A.2d 220 (Me. 1980) held that a complaint need not state specific facts that conclusively establish coverage and *Barrett Paving Materials, Inc. v. Cont'l Ins. Co.*, 448 F.3d 59 (1st Cir. 2007) affirmed that the focus is on the general allegations in the complaints, "not the facts as they may actually exist," Prime Tanning reasons that "[w]hether any particular release or discharge of a substance was or was not 'sudden and accidental' is not determinative" of the duty to defend. *Prime Tanning's Mot.* at 16-18. As the "'non-sudden and non-accidental' nature of the release . . . is not a necessary element to each of the stated causes of action," Prime Tanning argues that "even if these complaints specifically alleged that a release was <u>not</u> 'sudden and accidental' or pled facts that suggested it was not, such gratuitous allegations could not defeat the duty to defend." *Id.* at 18.

### 2. Liberty Mutual

Liberty Mutual responds that Prime Tanning's *Auto Europe* analysis would eviscerate the pleading comparison test under Maine and Missouri law. *Liberty Mutual's Resp. to Prime Tanning's Mot.* at 7-8. According to Liberty Mutual, the pleading comparison test requires the insurer to compare the insurance contract to the specific factual allegations in the pending lawsuits, not to "hypothesize regarding other claims" that are unstated but may fall within coverage. *Id.* at 8. Liberty Mutual argues that Prime Tanning misreads *Auto Europe* when it concludes that "[e]ven factual possibilities not mentioned in the complaint may trigger a defense." *Id.* at 9 (alteration in original) (quoting *Prime Tanning's Mot.* at 13). Liberty Mutual warns that Prime Tanning's reading of *Auto Europe* undermines *Dingwell* and *Barrett Paving*'s holdings that the pleadings "must raise a 'potential for liability within the coverage and contain[] no allegations of fact which would necessarily exclude coverage.'" *Id.* at 8 (quoting *Barrett Paving*, 488 F.3d at 66).

Applying the traditional pleading comparison test, Liberty Mutual argues, the pollution exclusion applies. Liberty Mutual analogizes Prime Tanning's byproduct to sludge from a wastewater treatment plant spread as fertilizer in *City of Sparta*. *Id.* at 15. Because *City of Sparta* found the sludge fertilizer to be a pollutant within the meaning of a similar pollution exclusion, Liberty Mutual claims that *City of Sparta* requires the application of the pollution exclusion here as well. *Id.* at 15-16 (citing *City of Sparta*, 997 S.W.2d at 547). Recognizing that *Jabar* reached a contrary result in Maine, Liberty Mutual argues that *Jabar* does

not govern "because it involved a fact pattern completely unlike this one, a different pollution exclusion and a law other than Missouri law." *Id.* at 15 (citing *Jabar*, 188 F.3d at 28-30). Although an ordinary insured "would not understand that the policy did not cover personal injury claims like those asserted" in *Jabar*, Liberty Mutual contends that an ordinary person would understand that Prime Tanning's byproduct met the clear terms of the pollution exclusion. *Id.* (citing *Jabar*, 188 F.3d at 30). According to Liberty Mutual, it does not matter whether the complaints refer to the byproduct as "sludge" or "fertilizer," since it fits within the meaning of the pollution exclusion and the policies "exclude coverage for injury or damage arising out of its discharge." *Id.* at 13-14.

Turning to the "sudden and accidental" exception, Liberty Mutual contends that Prime Tanning cannot "transform 26 years of applying thousands of tons of sludge into a sudden and accidental event." *Id.* at 17. Liberty Mutual uses *A. Johnson and Co. v. Aetna Casualty and Surety Co.*, 933 F.2d 66 (1st Cir. 1991) (applying Maine law) to distinguish *Dingwell* and *Barrett Paving*. *Liberty Mutual's Mem.* at 19-20. Whereas *Dingwell* and *Barrett Paving* found a duty to defend based on conclusory allegations of negligence that "left open the 'potential that liability [would] be established within the insurance coverage,'" Liberty Mutual distinguishes the Missouri Suits by pointing to their "detailed factual allegations concerning how the original discharges occurred." *Id.* at 19 (alteration in original) (quoting *Dingwell*, 414 A.2d at 226). Furthermore, Liberty Mutual contends that "[l]ike the claim at issue in *A. Johnson* and unlike the pleadings in *Dingwell* and

*Barrett Paving*," the complaints in the Missouri Suits foreclose the possibility that Prime Tanning's discharges were "sudden and accidental" because they occurred consistently over "a period of many years." *Id.*

Liberty Mutual urges the Court to find that Missouri law demands the same result. It cites *Aetna Cas. and Sur. Co. v. General Dynamics Corp.* 968 F.2d 707 (8th Cir. 1992) (applying Missouri law) for the proposition that the exception requires the discharge to be both "sudden *and* accidental." *Id.* at 17. In order to give "sudden" an independent meaning, Liberty Mutual states that Missouri courts interpret the term to "'include a temporal element such that it is abrupt, immediate and unexpected.'" *Id.* (quoting *Trans World Airlines, Inc. v. Associated Aviation Underwriters*, 58 S.W.3d 609, 622 (Mo. Ct. App. 2001)). Because "[i]t is axiomatic that repeated discharges of toxic sludge over a period of many years are not 'sudden' within the meaning of the exception to the pollution exclusion," Liberty Mutual concludes that "multiple decades of deliberate pollutant discharges" cannot be "sudden" as a matter of law. *Id.* at 19.

### B.  Legal Standards

#### 1.  Summary Judgment

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). On a summary judgment motion, "[a] genuine issue exists where 'a reasonable jury could resolve the point in favor of the nonmoving party.'" *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009)

(quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). "A fact is material only if it possess[es] the capacity to sway the outcome of the litigation under the applicable law." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (alteration in original) (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) (internal quotation marks omitted)). Where, as here, the parties have filed cross-motions for summary judgment, the Court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004) (citation omitted). The presence of cross-motions for summary judgment "does not alter or dilute" the summary judgment standard. *Kunelius v. Town of Stow*, 588 F.3d 1, 8 (1st Cir. 2009).

Federal jurisdiction in this case is premised on diversity of citizenship, and the Court applies state substantive law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Under Maine and Missouri law, "[w]hether an insurer has an obligation to defend its insured against a complaint is a question of law." *Elliot v. Hanover Ins. Co.*, 1998 ME 138, ¶ 6, 711 A.2d 1310, 1312; *accord Shelter Mut. Ins. Co. v. Ballew*, 203 S.W.3d 789, 792 (Mo. Ct. App. 2006) ("[w]hether an underlying petition has alleged a claim that is covered by the terms of the insurance policy is a legal question, which is not dependent on a factual determination of the underlying claims").. Because the only question the Court reaches—whether Liberty Mutual has a duty to defend Prime Tanning in the Missouri Suits—is a legal one, the issue is ripe for summary judgment.

Summary judgment is only appropriate in contractual disputes "when the contract language is not infected by some material ambiguity." *Elliot v. S.D. Warren Co.*, 134 F.3d 1, 9 (1st Cir. 1998). "An insurance contract is ambiguous if it is reasonably susceptible of different interpretations." *Kinney v. Me. Mut. Group Ins. Co.*, 2005 ME 70, ¶ 18, 874 A.2d 880, 885; *accord Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010) ("[l]anguage is ambiguous if it is reasonably open to different constructions"). When analyzing an insurance policy, a court must construe the unambiguous policy language "according to its plain and commonly accepted meaning." *Jack v. Tracy*, 1999 ME 13, ¶ 8, 722 A.2d 869, 871 (citation omitted); *accord Eldridge v. Columbia Mut. Ins. Co.*, 270 S.W.3d 423, 426 (Mo. Ct. App. 2008) (specifying that the plain meaning is determined "with reference to the context of the policy as a whole"). Any remaining ambiguity must be "resolved in favor of finding a duty to defend." *Me. Mut. Fire Ins. Co. v. Gervais*, 1999 ME 134, ¶ 8, 745 A.2d 360, 363; *accord Universal Underwriters Ins. Co. v. Dean Johnson Ford, Inc.*, 905 S.W.2d 529, 533 (Mo. Ct. App. 1995) (stating that ambiguous language is construed against the insurer).

## 2.    The Pleading Comparison Test

The pleading comparison test mandates that the Court compare "the allegations in the underlying complaint with the provisions of the insurance policy." *Penney v. Capitol City Transfer, Inc.*, 1998 ME 44, ¶ 4, 707 A.2d 387, 388 (quoting *Vigna v. Allstate Ins. Co.*, 686 A.2d 598, 599 (Me. 1996)); *accord Standard Artificial Limb, Inc. v. Allianz Ins. Co.*, 895 S.W.2d 205, 210 (Mo. Ct. App. 1995). "[I]f there

exists any legal or factual basis, which could be developed at trial, that would obligate the insurers to pay under the policy," the insured is entitled to a defense by the insurer. *L. Ray Packing Co. v. Commercial Union Ins. Co.*, 469 A.2d 832, 833 (Me. 1983); *accord Penn-Star Ins. Co. v. Griffey*, 306 S.W.3d 591, 596-97 (Mo. Ct. App. 2010) (explaining that "[i]f the allegations and ascertainable facts establish any *potential* or *possible* coverage, then the insurer has a duty to defend").[10] "The duty to defend depends only upon facts as alleged to be" and does not depend on their actual truth. *Am. Policyholders' Ins. Co. v. Cumberland Cold Storage Co.*, 373 A.2d 247, 250 (Me. 1977); *accord Trainwreck W. Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 39 (Mo. Ct. App. 2007).[11]

Although the duty to defend is broad, it is not limitless. The duty to defend "does not encompass alleged hazards not within the scope of the policy." *Baywood Corp. v. Me. Bonding & Cas. Co.*, 628 A.2d 1029, 1030-31 (Me. 1993) (finding no duty to defend when a complaint alleged "a business risk specifically excluded from the policy"). As a result, the duty to defend "cannot be triggered by pure speculation

---

[10] On this point, as explained below, there is a subtle difference between the Maine and Missouri comparison tests.

[11] The Court finds that there is no duty to defend regardless of which party carries the burden of proof on the pollution exclusion and the "sudden and accidental" exception. The Court recognizes that the nature of burden shifting under Maine law is less clear than under Missouri law. Under Missouri law, the insurer has the burden of proving that an exclusion bars coverage. *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 80 (Mo. Ct. App. 2005). If the insurer meets its burden, the insured has the burden of proving that an exception to the exclusion applies. *Trans World Airlines, Inc.*, 58 S.W.3d at 621.

Under Maine law "the courts have generally placed the burden of uncertainty as to the policy's coverage on the insurer." *Dingwell*, 414 A.2d at 227 (citation omitted) (placing the burden of proving an exclusion on the insurer). The Court has not identified any Maine case to articulate the specific burdens in the context of the duty to defend. *Cf. Barrett Paving*, 488 F.3d at 65 (explaining the insured has the burden of proving an exception to a pollution exclusion in the context of the duty to indemnify but finding that an insured met its burden under the duty to defend when it provided proof of potential coverage).

16

as to conduct or causes of action that are not either set forth in, or fairly suggested by, the allegations of the complaint." *W. World Ins. Co. v. Am. & Foreign Ins. Co.*, 180 F. Supp. 2d 224, 232 (D. Me. 2002) (applying Maine law); *accord Reliance Ins. Co. v. Shenandoah S., Inc.*, 81 F.3d 789, 791 (8th Cir. 1996) (applying Missouri law) (explaining that if the "complaint against the insured alleges facts not within the coverage of the insurance policy, no duty devolves upon the insurer").

### a.  The Maine Twist

Prime Tanning responds that *Auto Europe* modifies the traditional pleading comparison test in Maine by excluding from the comparison the allegations in the underlying complaint that are not essential to recovery. *Prime Tanning's Mot.* at 12. In *Auto Europe*, the First Circuit addressed a complaint that alleged a cause of action under the Maine Unfair Trade Practices Act (UTPA). *Auto Eur.*, 321 F.3d at 67-68. Although the Maine UTPA covers both intentional and unintentional conduct, the *Auto Europe* complaint alleged only intentional conduct, which was excluded from insurance coverage. *Id.* at 67. Even though the "complaint alleg[ed] only intentional conduct," the *Auto Europe* Court noted that the underlying cause of action "permit[ted] liability in the absence of an intent to deceive." *Id.* 68 The First Circuit stated that Maine law "broadly extends the duty to defend to claims that could be developed either legally or factually at trial so as to fall within the policy's coverage." *Id.* The *Auto Europe* Court concluded:

> In sum, when the cause of action alleged as the basis for liability does not include elements that would foreclose coverage, and where the events giving rise to the complaint may be shown at trial to fall within the policy's coverage, Maine law entitles the insured to a defense.

Indeed, we suspect that Maine's inclusive approach to the duty to defend is designed precisely for circumstances such as these—where a narrow reading of the complaint's factual allegations might preclude coverage, but the alleged cause of action is sufficiently broad that a modified version of the facts could be developed at trial to show liability.

*Id.* (citation omitted).  The First Circuit found a duty to defend under Maine law. *Id*.

Prime Tanning is correct that *Auto Europe* highlights a breadth in the pleading comparison test under Maine law not recognized by other jurisdictions. Maine law considers whether there exists "any legal or factual basis which could be developed at trial which would obligate the insurers to pay under the policy." *Auto Eur.*, 321 F.3d at 66.  Justice Carter writing for the Maine Law Court gave the initial formulation of the test:

[T]he insurer is under no obligation to defend its insured in the underlying proceeding if, when the allegations contained in the petition are compared with the terms and provisions of the contract, *there exists no legal or factual basis, which could be developed under that pleading at trial or hearing*, that would obligate the insurer to pay under the policy.

*Horace Mann Ins. Co. v. Me. Teachers Ass'n*, 449 A.2d 358, 360 (Me. 1982) (emphasis added).  Justice Carter emphasized that the duty to defend "is invoked by the *filing* of a complaint": "[b]ecause the duty to defend thus arises before the underlying proceeding is brought to trial or hearing, the facts as actually adduced there cannot be determinative of the existence and extent of the insurer's contractual obligations."  *Id.*  Consequentially, the Maine pleading comparison test attributes every possible legal significance to the facts contained in a complaint

under the legal theory asserted, regardless of the legal meaning the complaint itself attaches to those facts or the ultimate legal meaning attributed to those facts at trial.

In contrast, the Seventh Circuit, addressing a companion case to *Auto Europe*, found the allegations of the complaint did not impose a duty to defend under Illinois law. *Conn. Indemnity Co. v. DER Travel Serv.*, 328 F.3d 347, 350-51 (7th Cir. 2003). Although the First Circuit in *Auto Europe* observed in passing that a duty to defend would probably be found under Illinois and Florida law, *Auto Eur.*, 321 F.3d at 67, the Seventh Circuit expressly disagreed. *Conn. Indemnity Co.*, 328 F.3d at 351 n.2. The Seventh Circuit cited cases under Illinois law that found no duty to defend when the complaint alleged only intentional conduct, even though the cause of action could have included non-intentional conduct. *Id.* at 351. The Seventh Circuit noted, "while the district court correctly observed that negligent conduct is actionable under the Consumer Fraud Act, it is the actual complaint, not some hypothetical version, that must be considered." *Id.* at 350-51. Thus, Maine law allows a marginally more generous view of the allegations of the complaint..

*Auto Europe* does not, however, represent a departure from the pleading comparison test. Rather than abandoning the test, the *Auto Europe* Court simply found it satisfied because the facts in the complaint included the possibility of unintentional as well as intentional conduct. *Auto Eur.*, 321 F.3d at 68. The *Auto Europe* Court distinguished this test from other cases in which "the theory of relief chosen by the underlying plaintiff depended upon a showing of deliberate conduct,

placing any possible recovery outside the policy's coverage, and leaving the insurer with no duty to defend." *Id.* at 68. In other words, the breadth of the Maine pleading comparison test is limited to a consideration of the possible legal significance the facts alleged in a complaint may assume at trial. *Auto Europe* does not allow courts to consider unasserted legal theories and courts do not "speculate about causes of action that were not stated." *York Golf & Tennis Club v. Tudor Ins. Co.*, 2004 ME 52, ¶¶ 8, 17, 845 A.2d 1173, 1175 (complaint alleging defamatory statements regarding plaintiff's "reputation and livelihood" did not trigger duty to defend because policy excluded slander and libel claims and the complaint did not allege covered wrongful acts). Nor does *Auto Europe* allow courts to modify the facts contained in a complaint. *See Horace Mann*, 449 A.2d at 361 (complaint by teacher against the insured for failing to pursue a grievance on his behalf did not trigger duty to defend because insured only had coverage for the "written or oral declarations" it made to teachers). Since *Auto Europe*, the First Circuit has confirmed that "under Maine law, it is the face of the complaint that is examined in determining whether an insurer has a duty to defend." *Am. Guarantee & Liab. Ins. Co. v. Keiter*, 360 F.3d 13, 19 (1st Cir. 2004) (citing *Auto Eur.*, 321 F.3d at 66).

### b. The Missouri Twist

Missouri law, in contrast, includes in its pleading comparison test facts outside of the complaint. In Missouri, the "insurer cannot ignore safely actual facts known to it or which could be known to it or could be known from reasonable investigation." *Standard Artificial Limb*, 895 S.W.2d at 210. Thus, "the facts

known or ascertainable control the obligation to defend." *Id.* Missouri law defines "[a]ctual facts" as "those facts which were known, or reasonably should have been apparent at the commencement of the suit and not the proof made therein or the final result reached." *Id.* Missouri provides that "[i]f additional facts are ascertained which show that the action is not within the coverage of the policy, the insurer is not obligated to afford a defense." *Id.* At oral argument, Prime Tanning argued that under Missouri law, extrinsic facts could only be used to expand coverage. When pressed, however, it was unable to ameliorate its understanding with the clear language of *Standard Artificial Limb*, stating that extrinsic facts may be used to expand or deny coverage. *See Oral Arg. Tr.* 16:12-17:12.

The difference between the Maine and Missouri tests is subtle. Like Maine, Missouri does not determine coverage based on the evidence produced at trial in the underlying suit or its final result. *Id.* at 210; *accord Horace Mann*, 449 A.2d at 361. However, unlike in Maine, in Missouri under *Standard Artificial* extrinsic evidence beyond the allegations in the complaint affects coverage. It remains unclear whether Missouri courts would view Maine's "any legal or factual basis which could be developed at trial" formulation as consistent with its analysis of the duty to defend.

### 3. Choice of Law

The first step in a choice-of-law analysis is to "determine whether there is a conflict between the substantive laws of the interested jurisdictions." *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 29 (1st Cir. 1997). There is no conflict when "the resolution of a choice-of-law determination would not alter the

disposition of a legal question." *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005); *Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) (saying that choice of law is "unnecessary" where the "result will not vary"). In such a case, "a reviewing court need not decide which body of law controls." *Okmyansky*, 415 F.3d at 158. Because the Court finds that Liberty Mutual has no duty to defend Prime Tanning in either jurisdiction, the Court does not resolve the choice-of-law question.

### C.  The Pollution Exclusion Applies

### 1.  The Pollution Exclusion

The Liberty Mutual policies provide the following pollution exclusion:

This policy does not apply:
. . .
(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water: but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

*Policies* at 16. Prime Tanning argues that the pollution exclusion does not reach every "chemical substance that could cause harm" and should not apply "to liabilities arising out of the use of a product in the fashion contemplated for that product." *Prime Tanning's Mot.* at 19. Prime Tanning contends that simply because the complaints allege that the fertilizer ended up being a pollutant does not transform what Prime Tanning sold as fertilizer and its customers used as fertilizer into a pollutant. *Id.* Liberty Mutual responds that the specific factual allegations

in the complaints preclude a determination that the fertilizer was not pollution within the meaning of the policy. *Liberty Mutual's Resp. to Prime Tanning's Mot.* at 6.

### 2.    Maine Law Under *Jabar*

In 1999, the First Circuit addressed a pollution exclusion similar to the one in this case. There, Nautilus Insurance Company had issued a commercial insurance policy in favor of Michael Jabar, who was doing business as Mike's Roofing Company. *Jabar*, 188 F.3d at 28-29. An employee of a tenant in a building where Mr. Jabar's business had installed a roof sued him, claiming that she suffered occupational asthma as a result of exposure to fumes from the roofing products. *Id.* The Nautilus policy excluded coverage for bodily injury or property damage "which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." *Id.* at 29. The policy further defined "pollutants" to mean "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste . . . ." *Id.*

The First Circuit in *Jabar* addressed the policy terms "discharge," "dispersal," "release," and "escape" and concluded that these are "terms of art in environmental law and are generally used to refer to damage or injury resulting from environmental pollution." *Id.* at 30. The *Jabar* Court agreed that "an ordinarily intelligent insured would understand this provision to exclude coverage only for injuries caused by traditional environmental pollution." *Id.* The Court

went on to say that "an individual, like Jabar, engaged in a business not known to present the risk of environmental pollution would not understand that the Nautilus policy exclude[d] coverage for injuries arising from the use of products associated with that business for the purpose for which those products [were] intended." *Id.* (alterations in original) (internal citations omitted). The First Circuit limited the definition of "pollutant" to "only those hazards traditionally associated with environmental pollution." *Id.* at 31.

On their face, the pleadings in the Missouri Suits fit within the category of "traditional environmental pollution" defined in *Jabar*. The Missouri complaints do not allege that Prime Tanning manufactured and spread fertilizer that turned out to be hazardous; they allege that Prime Tanning manufactured and spread sludge that contained "hazardous levels of hexavalent chromium that is above acceptable limits of human exposure." *See, e.g., M. Gardner Compl.* ¶ 14.

Prime Tanning responds with two reasons for why *Jabar* compels a finding of coverage. First, it argues that the roofing products in *Jabar* were as hazardous as its own byproduct. Prime Tanning concludes that hazardous does not necessarily mean "pollutant" because the roofing products in *Jabar* were not considered pollutants even though they would be considered so "in a different context, *i.e.*, following disposal of those materials in a waste dump or other indiscriminate discharge into the environment." *Prime Tanning's Mot.* at 20. This "different context," however, is the exact context in which Prime Tanning disposed of its

byproduct. The Missouri Suits allege that the harm is from the disposal of the byproduct, not from the tanning process itself. *See*, *e.g.*, *M. Gardner Compl.* ¶ 13.

Second, Prime Tanning argues that the byproduct "was prepared by Prime Tanning to serve as a fertilizer." *Prime Tanning's Mot.* at 19. Because *Jabar* held that the pollution exclusion does not apply to a product's intended use, Prime Tanning argues that the pollution exclusion does not apply here. *Id.* The Court disagrees. The test for whether a "policy exclude[s] coverage for injuries arising from the [intended] use of products associated with [the insured's] business" is whether or not the insured was "engaged in a business not known to present the risk of environmental pollution." *Jabar*, 188 F.3d at 30. The question focuses on whether the insured's business poses traditional environmental risks, not whether the pollution exclusion was "intended to apply in a situation in which a product was being used in the fashion expected for such products." *Prime Tanning's Mot.* at 20. In other words, even if Prime Tanning used the byproduct in its expected fashion, the discharge still falls within the meaning of the pollution exclusion if it was done in the course of a business traditionally associated with environmental pollution.[12]

Here, spreading fertilizer is a traditional environmental risk, regardless of whether it was properly composed and handled as Prime Tanning argues. *See Prime Tanning's Mot.* at 20. Environmental monitoring and regulatory compliance requirements are consistent with a business traditionally associated with

---

[12] Although there is no evidence that Prime Tanning spread fertilizer as part of its tanning business operations, the Court considers Prime Tanning's argument because the complaints do not foreclose the possibility. If Prime Tanning is not in the fertilizer business, it cannot claim that it was using the byproduct for its intended use.

environmental pollution, and Missouri closely monitored and regulated Prime Tanning's fertilizer spreading. *See, e.g.*, *M. Gardner Compl.* ¶ 12, 20 (alleging Missouri was concerned with the byproduct-spreading aspect of Prime Tanning's business, requested information on the contents of the byproduct, and had a regulatory permit program); *Prime Tanning's Reply to Liberty Mutual's Resp.* at 4 (acknowledging that it needed "specific approval from environmental agencies" to prepare and spread the byproduct.)

To accept Prime Tanning's argument, the pollution exclusion would not apply whenever an insured called an otherwise hazardous waste by another name, in this case "fertilizer."[13] Because the spreading of the byproduct was traditional environmental pollution, the pollution exclusion applies under Maine law.

### 3. Missouri Law Under *City of Sparta*

The applicability of the pollution exclusion is broader under Missouri law than under Maine law because it does not restrict the exclusion to traditional environmental pollution. *See Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 105-06 (Mo. Ct. App. 2004) (stating that Missouri courts "have refused to limit pollution exclusions" to "traditional environmental pollution"). In *City of Sparta*, the insured sought coverage against claims alleging harm caused by toxic sludge removed during the city's wastewater treatment process and spread as fertilizer on

---

[13] As a policy matter, if businesses could insure themselves against the damage caused by their pollution simply by changing the name of the product, businesses would be encouraged not only to pollute but also to deceive.

a nearby farm. *City of Sparta*, 997 S.W.2d at 546-47.[14] In finding that a similar pollution exclusion precluded coverage, the Missouri Court of Appeals emphasized three considerations: first, "the substance at issue . . . [was] a sludge"; second, the plaintiff "pled the sludge contained substances toxic to humans"; and third, the pollution exclusion at issue barred "coverage for damage arising from exposure to toxic substances." *Id.* at 551.

Applying these three factors, the pollution exclusion unambiguously bars coverage for Prime Tanning's alleged conduct. First, as in *City of Sparta*, the complaints here allege that the waste product is a "sludge." *See, e.g.*, *M. Gardner Compl.* ¶ 10.[15] Second, the Missouri Suits allege that Prime Tanning's byproduct contained substances toxic to humans. *See, e.g.*, *id.* ¶¶ 9, 14. Third, Liberty Mutual's pollution exclusion bars coverage for damage arising from exposure to toxic substances. *Policies* at 16 (excluding coverage for "bodily injury or property damage arising out of the discharge . . . of . . . toxic chemicals"). As in *City of Sparta*, "[t]o hold that the [pollution exclusion] does not bar coverage for damage caused by [this type of activity] . . . would leave one wondering what kind of activity would be excluded by the [pollution exclusion]." *City of Sparta*, 997 S.W.2d at 552. Because the pollution exclusion unambiguously applies under both Maine and

---

[14] The pollution exclusion in *City of Sparta* did not contain a "sudden and accidental" exception but otherwise contained the same language as the exclusion here. *Compare City of Sparta*, 997 S.W.2d at 547, *with Policies* at 16.

[15] The *City of Sparta* Court did not explain the importance of referring to the waste product as "sludge," and the Court does not consider the description of the byproduct as "sludge" relevant. More significantly, the byproduct here and the sludge from City of Sparta were both alleged to be a "waste product." *City of Sparta*, 997 S.W.2d at 546.

Missouri law, Liberty Mutual has no duty to defend unless the "sudden and accidental" exception also applies.

### D.    The "Sudden" and "Accidental" Exception does not Apply

#### 1.    Maine Law: *Dingwell, A. Johnson*, and *Barrett Paving*

Although *Dingwell*, *A. Johnson*, and *Barrett Paving* reach different outcomes, all three apply the same legal principles.  In *Dingwell*, the Law Court held that the "sudden and accidental" exception applied because no specific theory of release was alleged.  *Dingwell*, 414 A.2d at 224-25.  The underlying complaint against the insured alleged that "as a result of negligence on the part of the [insured,] . . . products containing . . . [toxic] chemicals permeated the ground to the ground water table to the properties of the Plaintiffs resulting in the contamination of water in the Plaintiffs' wells."  *Id.* at 224.  Employing the pleading comparison test, the Court focused on the initial release of the pollutants and the failure of the complaint to allege a theory for how the pollution was released:

> [t]he class action plaintiffs, at this point, have no way of knowing how the toxic wastes entered the ground. There may have been either intentional dumping or burial or unintentional spills, leaks, or other accidents. The allegations in Count I encompass unintentional release into the ground, and do not necessarily describe a "deliberate process." Instead of specifically alleging negligent spills, leaks, or, other negligent acts, the complaint uses a broad and conclusory allegation that the pollution was "a result of negligence."

*Id.* at 224-25.  The Court concluded that, because the complaint "disclose[d] a potential for liability within the coverage and contain[ed] no allegation of facts which would necessarily exclude coverage," the "sudden and accidental" exception applied and the insurer was obligated to defend.  *Id.* at 227.

28

In *A. Johnson*, the First Circuit found that the specific facts alleged in the complaints precluded a finding that a release was "sudden and accidental." *A. Johnson*, 933 F.2d at 74. The underlying complaint in *A. Johnson* was a letter from the Maine Department of Environmental Protection (DEP) to the insured, complaining that "hazardous substances . . . were disposed of at the [insured's] Site and in such a manner that they have been or are being released into the soil and ground water posing a threat to the environment and to the health of the residents of the area." *Id.*[16] Specifically, the letter alleged that "[c]racked tanks were observed in a leaking condition which released their contents onto the ground." *Id.* at 75. In contrast to the pollution in *Dingwell*, the complaint in *A. Johnson* described the pollution as "a concomitant of the [the insured's] regular business activity in operating the tank cleaning and waste removal business at [the insured's] site over an extended period of time." *Id.* at 74. In finding no "sudden and accidental" release, the First Circuit explained that "[m]ere speculation under these circumstances that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence." *Id.* at 75.

In *Barrett Paving*, the First Circuit reaffirmed that the outcomes in *Dingwell* and *A. Johnson* depended on whether the factual allegations in the underlying complaints precluded the application of the "sudden and accidental" exception. The

---

[16] The First Circuit assumed for purposes of argument that the DEP letters "were the functional equivalent of a suit sufficient to trigger the duty to defend." *A. Johnson*, 933 F.2d at 72.

complaint against the insured in *Barrett Paving* alleged that an asphalt plant released hazardous materials into sewers that flowed into the Penobscot River. *Barrett Paving*, 488 F.3d at 61-62. In finding the "sudden and accidental" exception applied, the First Circuit distinguished *A. Johnson* because there, "[t]he insured was engaged in the waste disposal business . . . . [and] [t]he allegations specifically described how the discharges occurred." *Id.* at 64. Instead, the First Circuit reasoned that the *Barrett Paving* complaint, like the complaint in *Dingwell*, did not "specify how the pollutants may have been released from the facility into the soil or the sewers, *i.e.,* suddenly and accidentally, or through routine operations." *Id.* Because the underlying allegations were "not entirely inconsistent with a sudden and accidental discharge," the *Barrett Paving* Court found that the "sudden and accidental" exception applied. *Id.*

The complaints in the Missouri Suits are similar to *A. Johnson.* By claiming that Prime Tanning deliberately collected, transported, and spread a byproduct of the tanning process which contained a toxic level of a chemical known to cause cancer, the Missouri Suits specifically describe how the discharges occurred. *See*, *e.g.*, *M. Gardner Compl.* ¶¶ 13-14. Because the complaints allege that the spreading of the byproduct occurred for 25 years and that Prime Tanning was engaged in byproduct disposal as a part of its regular leather tanning business operations, the fertilizer disposal was not "sudden and accidental." *See*, *e.g.*, *M. Gardner Compl.* ¶¶ 7, 10, 13. Comparing the allegations in the complaints with the Liberty Mutual policies, the Court finds that "a reasonable reading of the allegations [shows] that

the entire pattern of conduct was not a 'sudden and accidental' occurrence." *A. Johnson*, 933 F.2d at 75.

Prime Tanning responds that the "sudden and accidental" exception applies if once spread, the byproduct "suddenly and accidentally" became toxic. *Prime Tanning's Resp. to Liberty Mutual's Mot.* at 7. Because the byproduct could have become toxic after "interaction with other chemicals in the environment," Prime Tanning concludes that the Court cannot determine as a matter of law that the "sudden and accidental" exception does not apply. *Id.*

As the Maine Supreme Judicial Court explained in *Dingwell*, however, "pollution exclusions focus on the *release* of pollutants." *Dingwell*, 414 A.2d at 225 (emphasis added).[17] The *Dingwell* Court stated that "[t]he behavior of the pollutants in the environment, *after* release, is irrelevant to these provisions." *Dingwell*, 414 A.2d at 225 (emphasis added). Here, the complaints allege:

> 10. From at least 1983 through early 2009, Prime utilized hexavalent chromium to remove hair from its hides in the tanning process. The waste product from this process was collected as "sludge" that contains hexavalent chromium.
> . . .
> . . . Prime hauled thousands of tons of sludge containing hexavalent chromium to Missouri farms, including farms in Andrew, Buchanan, DeKalb and Clinton counties, and applied thousands of tons of sludge containing hexavalent chromium to such farms with a spreader.

*M. Gardner Compl.* ¶¶ 10, 13. Because the complaints allege that the release occurred when the byproduct was spread, the focus is on whether the spreading was "sudden and accidental," not on whether the byproduct's toxicity developed

---

[17] The Liberty Mutual pollution exclusion is virtually identical to the *Dingwell* pollution exclusion. *Compare Dingwell*, 414 A.2d at 225, *with Policies* at 16.

suddenly after it was spread. Unlike in *Dingwell* and *Barrett Paving*, the allegations in the complaints here offer no potential for proof that Prime Tanning's spreading the byproduct was either sudden or accidental. In accordance with *Dingwell*, the possibility that after release the byproduct became toxic due to interaction with other chemicals is immaterial to coverage. Under Maine law, the "sudden and accidental" exception to the pollution exclusion does not apply.

### 2.    "Sudden and Accidental" Under Missouri Law

The "sudden and accidental" exception also does not apply under Missouri law. Missouri law requires a pollution discharge to be both "sudden *and* accidental" before the exception applies. *Trans World Airlines*, 58 S.W.3d at 622 (emphasis added). If Prime Tanning's pollution discharge was *either* not sudden *or* not accidental, Liberty Mutual has no duty to defend. Because the term "sudden" is unambiguous as a matter of Missouri law and Prime Tanning's actions do not fit the definition, the Court finds the exception does not bring Prime Tanning's pollution discharge within the scope of coverage. S*ee Gen. Dynamics*, 968 F.2d at 710.[18]

---

[18] Because the discharge was not "sudden," it is immaterial whether Prime Tanning's conduct was "accidental." *See Trans World Airlines*, 58 S.W.3d at 623 (denying a duty to defend because conduct was not "accidental," without reaching whether or not the conduct was also "sudden"). The Court acknowledges that the Missouri Suits raise the possibility that Prime Tanning's conduct was "accidental" under Missouri law.

On the one hand, the Eighth Circuit states that "accidental [means] that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen." *Gen. Dynamics*, 968 F.2d at 710 (quoting *St. Paul Fire & Marine Ins. Co. v. N. Grain Co.*, 365 F.2d 361, 364 (8th Cir. 1966)). The term depends on whether the pollution outcome was foreseen, not on whether the conduct is voluntary. *Cf. Liberty Mutual Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 923 (8th Cir. 1998) (applying Missouri law) (finding harm not accidental when the insured was aware of a continuing release of pollution). On the other hand, the Missouri Court of Appeals in *Trans World Airlines* stated that a "deliberate and frequent disposal of waste" is not consistent with the Eighth Circuit's interpretation of "accidental." *Trans World Airlines*, 58 S.W.3d at 622-23. The Court does not resolve the question.

Under Missouri law, the term "sudden" means an "abrupt, immediate and unexpected" event that "does not occur continuously over a significant period of time." *FAG Bearings*, 153 F.3d at 923; *Gen. Dynamics*, 968 F.2d at 710 (explaining that "because 'accidental' includes the unexpected . . . 'sudden' must mean abrupt"). In other words, "sudden" must include a "temporal element that joins together conceptually the immediate and the unexpected." *Gen. Dynamics*, 968 F.3d at 710 (citation omitted). Applying this standard, the Missouri Court of Appeals found the "sudden and accidental" exception applied to a complaint that alleged hazardous releases that "include but are not limited to spills from bulk tanks, leaking drums and tanks, and explosions and resultant leaking from tanks." *Superior Equip. Co. v. Md. Cas. Co.*, 986 S.W.2d 477, 480 (Mo. Ct. App. 1998). The court concluded that the allegations of "explosions and resultant leaking" raised the possibility that the pollution discharge was immediate and unexpected and thus "sudden." *Id.* at 482.

In contrast, the Missouri Suits allege behavior that occurred consistently over an extended period of time, asserting that Prime Tanning spread thousands of tons of byproduct over 25 years in multiple counties. *See, e.g.*, *M. Gardner Compl.* ¶ 13. In addition, Prime Tanning held a permit for its byproduct disposal program, which required daily testing, an application rate of five tons per acre per year, and a storage time limit of approximately three days. *Mo. Dep't Natural Res. Records* Attach. 29 at 2-3 (Docket # 23).[19] Such "deliberate and frequent disposal of waste" precludes the possibility that the harm was caused by a "sudden" event. *Trans*

___

[19] As mentioned above, the Missouri pleading comparison test includes "facts which were known, or should have been reasonably apparent at the commencement of the suit." *Trainwreck W.*, 235 S.W.3d at 42 (quoting *State ex. rel. Inter-State Oil Co. v. Bland*, 190 S.W.2d 227, 229 (Mo. 1945)).

*World Airlines*, 58 S.W.3d at 623 (finding no "sudden and accidental" exception to waste discharged from aircraft maintenance over a period of ten years in violation of environmental law).

Prime Tanning responds by focusing on its version of the comparison test. If the Court ignores the allegations in the complaints, Prime Tanning argues that "a long laundry list of the ways that Prime Tanning may be liable" raise the possibility that the harm was "sudden." *Prime Tanning's Reply to Liberty Mutual's Resp.* at 6. However, by employing the Missouri comparison test, the Court concludes that the discharge here was not sudden. The volume, time period, and area of the harm alleged in the complaints are inconsistent with an "unexpected event that does not occur continuously over a significant period of time." *FAG Bearings*, 153 F.3d at 923. These allegations foreclose the possible development of the factual nexus between the "immediate and the unexpected" necessary to apply the exception. Because the "sudden and accidental" exception does not apply, the pollution exclusion does as a matter of Maine and Missouri law. Because Liberty Mutual has no duty to defend, it also has no duty to indemnify Prime Tanning under either Maine or Missouri law.[20]

## IV.     CONCLUSION

---

[20] In both jurisdictions, "[t]he duty to defend is broader than the duty to indemnify." *Centennial Ins. Co.*, 564 F.3d at 50 (quoting *Bucci*, 393 F.3d at 292) (internal quotation marks omitted) (applying *Commercial Union*)); *accord Sawyer v. Bi-State Dev. Agency*, 237 S.W.3d 617, 621 (Mo. Ct. App. 2007). Conversely, "[i]f the insurer has no duty to defend . . . then there is no duty to indemnify the insured for the same claim." *Anderson v. Va. Sur. Co., Inc.*, 985 F. Supp. 182, 186-87 (D. Me. 1998) (applying Maine law); *Am. Policyholders'*, 373 A.2d at 250 (explaining that the "duty to defend depends only upon the facts as alleged to be, [whereas] the duty to indemnify, i.e., ultimate liability, depends rather upon the true facts"); *accord Trainwreck W. Inc.*, 235 S.W.3d at 44.

The Court DENIES Prime Tanning's Motion for Partial Summary Judgment (Docket # 26) and GRANTS Liberty Mutual's Motion for Summary Judgment (Docket # 30).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 10th day of November, 2010